## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRYAN L. MOORE,                )
                                 )
       Plaintiff,           )
                                 )
       v.                )       Civil Action No.  08-1012
                                 )       Judge Nora Barry Fischer
DARLINGTON TWP., ET AL.,    )
                                 )
       Defendants.     )

## MEMORANDUM OPINION

### I.     INTRODUCTION

This is a First Amendment employment retaliation case.  Presently before the Court is Defendants' Motion for Summary Judgment. (Docket No. 71).  Plaintiff Bryan L. Moore ("Plaintiff") brings this action against Defendants Darlington Township, a second class township in Beaver County, Pennsylvania ("Township"), and the Township Supervisors Hans Dahlin ("Dahlin")[1], Robert McRoberts ("McRoberts"), and John Nicely ("Nicely") (collectively "Defendants") seeking injunctive relief, declaratory judgment, compensatory damages, attorney's fees and costs, and any other relief the Court deems appropriate from all of the Defendants, as well as punitive damages from the individual Defendants.  Plaintiff, a former Darlington Township police officer, alleges that he was demoted from police chief to patrolman and eventually fired, both in retaliation for his involvement in the following activities: (1) his refusal to sign a petition in support of Defendant

---

[1] Defendant Dahlin's name is incorrectly spelled "Dahlan" in the caption to this matter.

Dahlin's campaign to be reelected as Township Supervisor, and his complaint to Defendant Supervisors regarding being asked to do so; (2) his perceived support of his brother Timothy Moore in his own campaign for Township Supervisor; (3) his criticism of Defendants for hiring Holly Nicely ("Ms. Nicely") and compensating her with benefits that were not made available to Plaintiff when he was police chief; and (4) his exercise of his right to receive Workers' Compensation benefits from the Commonwealth of Pennsylvania. Of the claims initially filed by Plaintiff, only one remains: a claim pursuant to 42 U.S.C. § 1983 under which Plaintiff claims that the adverse employment actions taken against him by Defendants violated his rights protected by the First and Fourteenth Amendments to the United States Constitution and Article I, §§1, 2, 7, 20, and 26 of the Pennsylvania Constitution. The central question for the Court is whether Plaintiff's activities were protected by the First Amendment.

For the following reasons, Defendant's Motion will be GRANTED, in part, and DENIED, in part.

## II.    FACTUAL BACKGROUND

Unless otherwise specified, the following facts are uncontested.

### A.    Plaintiff's Employment History

Plaintiff began employment with Defendant Township as a part-time police officer with a rank of patrolman in October of 1999. (Docket No. 35 at ¶ 9). In April of 2001, he was promoted to Police Chief of Defendant Township. (*Id.* at ¶¶ 9, 11, 14). This position did not include benefits. (*Id.* at ¶ 10). At the same time, Plaintiff worked seasonally as a park ranger with the Pennsylvania Department of Conservation and Natural Resources ("Pa. D.C.N.R."), a position for which he did

receive benefits. (*Id.* at ¶¶ 10, 12).  In November of 2003, Plaintiff's position as a park ranger with Pa. D.C.N.R. became full-time, and that December, Defendant Township cut Plaintiff's work hours as Police Chief to part-time, at the same hourly wage. (*Id.* at ¶¶ 13-14).

Plaintiff continued to work both jobs until March 2, 2006, when, within the course and scope of his employment with Pa. D.C.N.R., he sustained a shoulder injury.  (*Id.*)  He has since undergone multiple surgical procedures and continues to be at least periodically limited in his ability to perform certain activities, such as lifting, carrying, and driving. (*Id.* at ¶ 15).  As a result of this injury, Plaintiff has received Workers' Compensation benefits at various times, beginning on March 30, 2006. (*Id.* at ¶ 16; Docket No. 51-2 at ¶ 2(d)).

### B.      Plaintiff's Allegedly Protected Activities

Plaintiff undertook a number of activities that he now contends were the basis for Defendants' improper retaliation.

On February 12, 2007, Plaintiff attended a public meeting of Darlington Township.  He attended the meeting in uniform in his capacity as Police Chief. (Docket No. 35 at ¶ 17). At the meeting Plaintiff was asked to sign a petition to add Defendant Dahlin's name to the ballot for the May 2007 Township Supervisor primary election. (*Id.*).  Plaintiff refused to sign Mr. Dahlin's petition because he believed it was improper for him to be asked to do so while he was on duty and in uniform. (*Id.*).  Following the meeting, Plaintiff approached Defendants Nicely, Dahlin, and McRoberts to explain that he thought it was "unprofessional for them to ask [him] while [he] was in full uniform to sign a petition and, also, that [he] was a state employee and didn't know [if he] was permitted to sign their petition." (Docket No. 73-1 at 18).  He also wanted to inform them that his refusal to sign had nothing to do with his brother, who was running against Defendant Dahlin in the

upcoming primary. (*Id.*).  Plaintiff testified that he was told by Defendant McRoberts in June 2007 that he was not being allowed to return to work at that time, after his second surgery, because Defendant Dahlin was angry that Plaintiff had not signed the petition during the February 12, 2007 public meeting. (Docket No 73-1 at 7, 9).

Ms. Nicely, Defendant Nicely's daughter-in-law, was hired as a part-time Secretary and Treasurer for the Township, but received vacation pay and other benefits. (*Id.* at ¶19).  Considering salary and benefits combined, Ms. Nicely was effectively paid more than the Police Chief, Plaintiff. (*Id.*).  Plaintiff wished to receive the same benefits as Ms. Nicely. (Docket No. 73-1 at 45). He testified that he complained of the inequity to Defendants on numerous occasions.  (*Id.*).

Finally, as described above, Plaintiff applied for and received Workers' Compensation benefits through the Commonwealth of Pennsylvania in conjunction with his Pa. D.C.N.R. job.

### C.     Plaintiff's Demotion and Termination

Following a shoulder surgery, Plaintiff was released to return to full duty as of December 17, 2007 by his treating physician, Dr. Chris Vasilakis. (Docket No. 35 at ¶ 22).  Plaintiff testified that on December 18, 2007, Defendant Dahlin told him that he could return to work for Defendant Township once he provided a medical release from his physician stating that he could return to full duty. (Docket No. 73-1 at 50-1).  Plaintiff claims that he left the required medical release on Dahlin's desk when he went in for a meeting with him that day.  (Docket No. 73-1 at 28-30).  Defendants claim that they did not receive it until a copy was faxed to the Township on February 22, 2008. (Docket No. 72 at ¶¶13-4).

Plaintiff testified that he was told at the December 18, 2007 meeting with Defendant Dahlin

4

that he was being demoted and would not be allowed to return to work as Police Chief for Defendant Township. (Docket No. 73-1 at 33-5). As justification, Defendant Dahlin cited the following issues: (1) Plaintiff's failure to provide Defendant Township with documentation demonstrating the proper investment of retirement funds given to him by Defendant Township; (2) Plaintiff's failure to file his work schedules regularly; (3) Plaintiff's failure to conduct patrols properly; (4) Plaintiff's efforts to avoid obtaining building and septic tank permits required by Defendant Township; and (5) Plaintiff's failure to advise Defendant Township that he was receiving Workers' Compensation benefits. (Docket No. 73-5). As evidence, Defendants produced a January 4, 2008 letter to Plaintiff outlining these reasons. (*Id.*) Plaintiff denies the truth of all of these reasons. (Docket No. 35 at ¶ 24). This demotion from police chief to patrolman included a decrease in pay from $15.35/hour to $13.00/hour, the pay rate for a new patrolman. (*Id.* at ¶ 23). Defendants claim that Plaintiff was not officially demoted until Defendant Township's reorganization meeting on January 7, 2008. (Docket No. 71 at ¶ 9).

However, Plaintiff never actually returned to work for Defendant Township. (*Id.* at ¶ 24). Instead, Plaintiff's employment with Defendant Township was terminated at a public meeting on February 25, 2008. (Docket Nos. 72 at ¶26; 77 at ¶11). Plaintiff claims that the following reasons, all of which he denies, were given for the termination: (1) an incident between Plaintiff and Plaintiff's father-in-law that occurred at the home of Plaintiff's father-in-law in December of 2007; (2) Plaintiff's assault on his wife on February 1, 2008; and (3) Plaintiff's failure to return his police chief badges to Defendant Township. (Docket No. 77 at ¶12). Defendants, however, contend that his discharge had nothing to do with any 2007 incident and that Plaintiff was discharged for: (1) a verbal altercation with his father-in-law on February 1, 2008; (2) physically assaulting his wife on

February 1, 2008; and (3) his failure to return his police chief badges and a bullet-proof vest. (Docket No. 73 at ¶26).  In support of which, Defendants have produced a February 28, 2008 letter outlining the above reasons for his termination.  (Docket No. 73-14).  Plaintiff does admit that he was arrested in connection with a February 2008 domestic incident and that he was charged with misdemeanor assault, but points out that the charges were eventually dropped. (Docket 73-1 at 62).

Regardless, Plaintiff alleges that he was demoted and eventually terminated by Defendants in retaliation for: his refusal to sign a petition in support of Defendant Dahlin's campaign to be reelected as Township Supervisor;  his perceived support of Plaintiff's brother in his campaign for Township Supervisor; his criticism of Defendants for having hired Ms. Nicely and offered her benefits that were not offered to Plaintiff when he was police chief; and for his exercise of his rights to receive Workers' Compensation benefits from the Commonwealth of Pennsylvania.


## III.    PROCEDURAL HISTORY

Plaintiff filed his Initial Complaint on August 5, 2008, alleging deprivations of his rights under the First and Fourteenth Amendments to the United States Constitution and under Article I, §§1, 2, 7, 20, and 26 of the Pennsylvania Constitution, as well as violations of the Rehabilitation Act of 1973, the Pennsylvania Whistleblower Act, and the tort of wrongful firing under Pennsylvania law. (Docket No. 6).

Defendants filed a Partial Motion to Dismiss on September 2, 2008.  (Docket No. 14). Plaintiff filed a Response (Docket No. 19) and an Amended Complaint on September 22, 2008. (Docket No. 18).

Since the filing of the Amended Complaint mooted the Motion to Dismiss, Defendants filed

6

a second Partial Motion to Dismiss on October 6, 2008.  (Docket No. 21).  Plaintiff filed a Response

(Docket No. 27) and, after mediation, a Motion to Withdraw (Docket No. 31) his claims under the

Rehabilitation Act of 1973, the Pennsylvania Whistleblower Act, and Pennsylvania tort law, which

was granted on December 16, 2008.  (Docket No. 32).  Subsequently, the Court granted, in part, and

denied, in part, Defendant's October 6, 2008 Motion to Dismiss, striking Plaintiff's "deprivation of

liberty without due process" claim and dismissing Plaintiff's claim for punitive damages against

Defendants Dahlin, McRoberts, and Nicely in their official capacities (Docket No. 34). *Moore v.

Darlington Twp.* C.A. No. 08-1012, 2008 WL 5339372 (W.D. Pa. 2008).

Thereafter, Plaintiff filed a Second Amended Complaint on January 5, 2009, with a single

§ 1983 claim, alleging that he was deprived of his rights under the First Amendment to the United

States Constitution, as applied to the states via the Due Process clause of the Fourteenth

Amendment, and his rights under Article I, §§1, 2, 7, 20, and 26 of the Pennsylvania Constitution,

when Defendants, acting under color of state law, terminated[2] his employment with Defendant

Township (Docket No. 35).  Defendants filed their Answer and Affirmative Defenses on January 20,

2009. (Docket No. 38).  Discovery ensued.

At the end of discovery, Defendants filed a Motion for Summary Judgment which is currently

before this Court, on June 15, 2009. (Docket No. 73).  With their Motion, Defendants filed a Concise

Statement of Material Facts with supporting exhibits and a Brief in Support (Docket Nos. 72-74).

Plaintiff's Response, with supporting Appendix, Brief in Opposition, and Concise Statement of

---

[2]

The single claim in Plaintiff's Second Amended Complaint, refers only to "wrongful termination" in its title,  but in its body, it alleges both his demotion and termination as retaliatory actions.  (Docket No. 35).

Material Facts were filed on August 14, 2009.  (Docket Nos. 77-80).  Defendants filed a Response

to Plaintiff's Concise Statement of Material Facts and a Reply Brief on August 24, 2009.  (Docket

Nos. 81-82).  Plaintiff filed a Sur-Reply Brief in Opposition on August 31, 2009.  (Docket No. 83).

The Court will now rule on Defendants' Motion.

## IV.   STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against

the party "who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there

is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a

verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  The mere

existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson*

*v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the

evidence, to determine the truth of the matter, or to evaluate credibility.  The court is only to

determine whether the evidence of record is such that a reasonable jury could return a verdict for the

non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d

Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).  In evaluating the

evidence, the court must interpret the facts in the light most favorable to the non-moving party, and

draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## V.    DISCUSSION

The Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"), provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

§ 1983, thereby, creates a cause of action for violations of the United States Constitution and federal laws but does not itself grant any substantive rights; in order to establish a claim under the statute, a plaintiff "'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'"[3] *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141  (3d Cir. 1993)).

The first step in evaluating a § 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all.  *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5 (1998); *Nicini*

---

[3]

Nowhere in their pleadings do Defendants deny that they were state actors acting under color of state law.

*v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).  In the instant case, Plaintiff is claiming violations of

his First Amendment rights.[4]  The Court must, therefore, first determine whether the acts for which

he claims he suffered retaliation were protected by the First Amendment, before determining if the

adverse employment actions were actually in retaliation for them.  Plaintiff claims to have been

retaliated against for a number of different activities, each of which must be examined to determine

whether it is protected by the First Amendment, which provides:

> Congress shall make no law respecting an establishment of religion or prohibiting the
> free exercise thereof; or abridging the freedom of speech, or of the press, or the right
> of the people peaceably to assemble, and to petition the Government for a redress of
> grievances.

U.S. CONST. AMEND. I. The First Amendment has been incorporated by the Due Process clause of

---

[4]

Plaintiff's Second Amended Complaint contains only one count, bringing a single claim under § 1983. (Docket No. 35 at 3-8).  Within that claim, Plaintiff also mentions potential violations of the Pennsylvania Constitution, but since § 1983 protects only the "rights, privileges, or immunities secured by the Constitution and laws of the United States," it is inapplicable to any rights protected by state statutes or the state constitution.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119 (1992) ("Although [§ 1983] provides the citizen with an effective remedy against those abuses of state power that violate federal laws, it does not provide a remedy for abuses that do not violate federal law.")  Perhaps out of an abundance of caution, Defendants argue that Plaintiff has failed to state a claim based on the Pennsylvania Constitution since the Pennsylvania Constitution does not create a private right of action for damages. (Docket Nos. 71 at 4, 74 at 18-9).  Plaintiff responds to this in a footnote by pointing out that he has advanced claims for injunctive and declaratory relief in addition to damages, but does not address the fundamental question of whether his § 1983 claim can encompass alleged violations of the Pennsylvania Constitution. (Docket Nos. 83 at 1, n. 1).  Therefore, noting that Plaintiff has withdrawn all of his independent state law claims, the Court does not construe his Second Amended Complaint as making any claims under the statutes or Constitution of Pennsylvania.

Similarly, Plaintiff's single claim also alleges that he has been "deprived of liberty without due process . . . in violation of the . . . Fourteenth Amendment[]." (Docket No. 35 at 8).  This same claim was stricken from Plaintiff's first Amended Complaint upon Defendants' Motion to Dismiss, based on Plaintiff's admission that he had no liberty or property interest in his employment with the Township. *Moore v. Darlington Twp.* C.A. No. 08-1012, 2008 WL 5339372, at *2 (W.D. Pa. 2008).  Based on that same admission, the Court will not consider any Fourteenth Amendment claim based on lack of due process for deprivation of a liberty interest in Plaintiff's Second Amended Complaint.

10

the Fourteenth Amendment, and is therefore applicable to state actors. *United Bhd. of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 831 (1983).

The First Amendment protects a number of rights under its different clauses, including the rights to speak and associate freely under the Free Speech Clause and the right to petition the government for a redress of grievances under the Petition Clause. Although Plaintiff's complaint only alleges that "he has been deprived of his rights to speak freely and to associate freely," the Court finds that both of these clauses are implicated here. (Docket No. 35, at ¶ 32).[5]

The Free Speech Clause protects both freedom of speech and freedom of association. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) ("implicit in the right to engage in activities protected by the first Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). Therefore, it protects both the right to speak freely on public matters, *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and the right to affiliate oneself with a

---

[5]

In his Brief in Opposition to Defendants' Motion for Summary Judgment, Plaintiff acknowledges that "he made no claim under the 'petition' clause of the First Amendment" before proceeding to make arguments regarding Third Circuit precedent concerning the Petition Clause. (Docket No. 80, 8-9). In their Reply Brief, Defendants draw the Court's attention to this admission. (Docket No. 82, 4). In his Sur Reply Brief, Plaintiff admits that "this is exactly what plaintiff said in his earlier brief" and then argues that he should be allowed to file a third amended complaint, "to the extent that the Court may consider this crucial." (Docket No. 83, 3). In *Brennan v. Norton*, a case much like this one, the Court of Appeals for the Third Circuit held that where a plaintiff asserted a First Amendment claim based on the Speech and Association Clauses, as here, he could not assert a Petition Clause claim in his brief opposing summary judgment, as Plaintiff seeks to do here. *Brennan v. Norton*, 350 F.3d 399, 417 (3d Cir. 2003). Thus, if it were a dispositive question, the Court would need to consider Plaintiff's request to amend. However, since the Court finds that the only claim implicating the Petition Clause (Plaintiff's application for Workers' Compensation benefits) fails on other grounds (*see* Section V.C.1. *infra*), the Court need not decide whether it would be proper or necessary to allow him to amend his complaint further.

political party, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990). A number of Plaintiff's activities potentially implicate these protections. The right to speak freely on public matters is potentially implicated by: his refusal to sign Defendant Dahlin's candidate petition; his complaints when he was asked to do so; and his complaints regarding the compensation of Holly Nicely. The right to freedom of political affiliation is potentially implicated by Plaintiff's refusal to sign Dahlin's petition and by his perceived support of his brother as a political candidate.

The Petition Clause protects the right "to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. This protection is potentially implicated in Plaintiff's application for Workers' Compensation benefits.

To determine whether a public employee's speech is entitled to First Amendment protection, the Court applies a

> three-step test derived from the Supreme Court's decisions in *Connick v. Myers* and *Pickering v. Board of Education*. **[1]** First, [the Court] must determine whether the speech addresses a matter of public concern. If it does, [the Court] then employ[s] **[2]** the *Pickering* balancing test to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption. . . . Finally, if these criteria are met, **[3]** plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. A public employer can rebut an employee's claim of retaliation by demonstrating that it would have reached the same decision, even in the absence of the protected conduct. Whereas the first and second step inquiries are questions of law for the court,[6] the final inquiry presents a question of fact for the jury.

*McGreevy*, 413 F.3d at 364 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563

---

[6]

The Court takes the view expressed in *Foraker*, 501 F.3d at 240, that the first step can be a "mixed question of fact and law."

(1968); and *Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 2001)) (emphasis and numbers added). If a plaintiff fails to make any one of the requisite showings for each of his claimed protected activities, the inquiry as to that activity ends and the plaintiff's related claim fails.

Step One is addressed in section A below,  Step Two in section B, and Step Three and the subsequent determination of whether Defendant Township would have reached the same decision absent the protected activity in section C.  Finally, in section D, the Court considers the question of punitive damages against the individual Defendants.

### A.    Are Plaintiff's Activities Protected by the First Amendment?

#### 1.    *Plaintiff's Free Speech Clause Claims: Speech and Political Affiliation*

As discussed above, the Free Speech Clause protects both speech and political affiliation. The Court will consider the applicable standards and then determine which of Plaintiff's activities are protected by each.

As far as speech, in order to pass the first step of the inquiry, Plaintiff must show that he "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). To do so, he must navigate between the precedential Scylla and Charybdis of *Connick* and *Garcetti* by showing both that his speech was not on a matter of purely personal interest, *Connick v. Myers*, 461 U.S. 138 (1983), and that it was not made pursuant to his official duties, *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).

In *Connick*, the Supreme Court identified the first potential obstacle, holding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest . . .  a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken . . .  in reaction to the employee's behavior."

13

*Connick v. Myers*, 461 U.S. 138, 146 (1983).  Thus, in *Connick*, when an assistant district attorney distributed a questionnaire to her coworkers regarding office morale and whether employees trusted their supervisors, the Court examined the "content, form and context . . . as revealed by the whole record," of her activity to find that most of the questions were not "of public import in evaluating the performance of the District Attorney as an elected official" and therefore not matters of public concern.  *Id*. at 148.  However, the Court found that one question, whether "assistant district attorneys 'ever feel pressured to work in political campaigns on behalf of office supported candidates,'" was "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id*. at 149.

In *Garcetti*, the Supreme Court identified the other potential obstacle, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Thus, in *Garcetti*, when a supervising district attorney wrote a memorandum to his superiors regarding potential problems with a search warrant in a particular case, and when he subsequently testified to same at a hearing on a defense motion challenging the warrant, the Court found that:

> [t]he significant point is that the memo was written pursuant to Ceballos' official duties.  Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22.

Though it did not undertake it in *Garcetti*, the Court provided guidance in dicta that the "proper inquiry" for determining whether an act was pursuant to the employee's official duties "is

14

a practical one," that "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and [that] the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25. The Court of Appeals for the Third Circuit took up the question in *Foraker v. Chaffinch*, 501 F.3d 231, 248 (3d. Cir 2007), when it held that the plaintiffs', former state troopers, complaints to their supervisors and subsequent statements to the State Auditor about safety at a state trooper firing range were activities undertaken pursuant to their official duties. As the Court of Appeals explained, the plaintiffs "were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command" and they were also compelled by executive order of the Governor's office to report the same to the State Auditor. *Id.* at 243. "Because the speech that motivated the [Governor's office's] order was within their job duties [i.e. reporting the conditions to their immediate superiors], the responsibility to respond to the subsequent order was also within the scope of their duties." *Id.*[7] Thus, the standard guiding this inquiry is whether the speech in question was made pursuant to the practically understood or expected duties of a plaintiff's employment.

Plaintiff may also be entitled to First Amendment protection for his political affiliation. In a line of cases beginning with *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court of the United States has established that the First Amendment protection of free speech and free association

---

[7]

In contrast, the *Foraker* court distinguishes *Lindsey v. City of Orrick*, 491 F.3d 892 (8th Cir. 2007), wherein the Court of Appeals for the Eighth Circuit held that a public employee's complaints at a public meeting that the City was not complying with state sunshine law requirements was made both as a citizen and on a matter of public concern, because there was no evidence that the employee's job duties even arguably included sunshine law compliance. *Foraker*, 501 F.3d 231, 243 (3d. Cir 2007).

prohibits the firing, hiring, promotion, transfer, or recall of public employees based on their political party affiliations. *Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).   In *Elrod*, the Court first established that it was unconstitutional for a public employer to dismiss an employee based on party affiliation. *Elrod*, 427 U.S. at 372.  In *Branti*, the Court explained  that the question of "whether a position is one in which political affiliation is a legitimate factor to be considered" "is not always an easy one," and that while requirements of confidentiality and policymaking duties can be relevant, the ultimate inquiry is whether the employer "can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518; *see also Galli v. New Jersey Meadowlands Comm'n*, 49 F3d 265, 270-71 (3d Cir. 2007).   In *Rutan*, the Court expanded these protections to cover hiring, promotion, transfer, and recall of public employees as well as termination. *Rutan*, 497 U.S. at 65.  As the Court of Appeals for the Third Circuit has noted, "identical party affiliation does not necessarily ensure the subordinate's loyal adherence to the superior's policies.  Primary election fights can be famously brutal, sometimes more so than contests in the general election, and animosity between candidates is likely to result." *Curinga v. City of Clairton*, 357 F.3d 305, 311  (3d Cir. 2004).   Thus, this inquiry is not limited strictly to questions of party membership, but can include other kinds of shared political purpose, partisan activity, and political support.  *See id.* (citing *Kaluczky v. City of White Plains*, 57 F.3d 202,208 (2d Cir. 1995); *Williams v. City of River Rouge*, 909 f.2d 151, 153 n.4 (6th Cir. 1990)).

> ### a.   *Plaintiff's Refusal to Sign Dahlin's Petition and His Related Complaint to Defendant Supervisors*

Defendants argue that Plaintiff's refusal to sign Defendant Dahlin's candidacy petition at a

public meeting and his subsequent complaints about it were undertaken pursuant to his official duties and therefore were not speech undertaken "as a citizen [speaking] on a matter of public concern." *Garcetti*, 547 U.S. at 418.  While it is not dispositive of the issue, the Court notes that Plaintiff's refusal to sign was undertaken publicly, at a town supervisor's meeting, while his subsequent complaint was more in the nature of a private, within the workplace, act.  *See Foraker*, 501 F.3d at 241 (2007) ("As the Court explained in *Garcetti*, the facts that 'Ceballos expressed his views inside the office, rather than publicly,' and that his memo concerned the subject matter of his employment, were non-dispositive.").

It is undisputed that, at the time when the event occurred, Plaintiff was attending the meeting as Police Chief of Darlington Township. (Docket Nos. 35 at ¶ 17; 74 at 9-11).  In his Second Amended Complaint, Plaintiff states that he believed "it improper that he had been given this petition while at a public meeting on duty and in uniform, [and therefore] refused to sign," as he testified during his deposition (Docket Nos. 35 at ¶ 17; 73-1 at 18-21).  Defendants argue that if the presentation of the petition were a violation of Pennsylvania ethics laws, then it would be within Plaintiff's duties to report it, which he did not do beyond complaining to the Township Supervisors themselves.  (Docket No. 74 at 10).[8]  Plaintiff denies that enforcing state ethics laws is within the duties of a Township police officer.  (Docket No. 80 at 9-10).

Beyond the arguments of counsel, the Court has been given little guidance by the parties as to whether enforcing state ethics laws falls within Plaintiff's job duties.  Defendants argue that

---

[8]

If it did violate state law, it would violate 65 Pa.C.S. § 1103, governing conflicts of interest. The Court makes no determination as to whether presenting the petition to Plaintiff violated the law or whether it would have violated the law if Plaintiff had signed it.

"Moore took an oath of office wherein he was sworn to uphold the Constitution of the United States and the Constitution of the State of Pennsylvania" and that "it was in his job description to report violations of the law."[9]  (Docket No. 74 at 10).  Plaintiff argues that he does not believe that it is part of his job to enforce state ethics laws and that requiring him to do so would lead to "absurd, if not preposterous results," wherein a township police officer would be required to be conversant with and enforce any number of "arcane provisions" of state law.  (Docket No. 80 at 10).  As the Supreme Court made clear in *Garcetti*, public employers cannot restrict employees' rights by creating overly broad job descriptions, and formal "job descriptions often bear little resemblance to the duties an employee actually is expected to perform."  *Garcetti*, 547 U.S. at 424-25.  A broadly phrased oath of office cannot, therefore, be used to determine the scope of Plaintiff's official duties, and the Court must undertake the "practical" inquiry prescribed by *Garcetti*.  *Id*.  In doing so, the Court also notes that Plaintiff testified that he complained that he thought it was "unprofessional," "wrong" and "improper" that he was asked to sign, not that it was "illegal."  (Docket No. 73-1 at 18-21).

"'[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Foraker*, 501 F.3d at 239 (quoting *Garcetti*, 547 U.S. at 421).  When Plaintiff refused to sign the petition, he was "on duty, in uniform, and engaged in discussion with [his] superiors," which some courts have found sufficient to show that speech was made in the course of a public employee's official duties. *Mills v. City of Evansville, Ind.*, 452 F.3d

---

[9]

Although a job description is not dispositive of the issue, *see Garcetti*, 547 U.S. at 424-25 2006), it would provide some guidance for the Court.  However, no written job description has been provided by either party.

18

646, 648 (7th Cir. 2006). However, in *Foraker*, the Court of Appeals for the Third Circuit, while citing *Mills v. City of Evansville*, did not adopt this reasoning and focused on the practical question of whether the speech was "made pursuant to employment duties" and was "among the tasks [the plaintiff was] paid to perform." *Foraker*, 501 F.3d at 241. The Appeals Court revisited this issue in *Heller v. Fulare* 282 Fed. Appx. 184 (3d Cir. 2008), affirming the District Court's grant of summary judgment when the defendant showed that the plaintiff police officers' complaints to an investigatory committee about the conduct of another officer were made pursuant to their employment duties, because one plaintiff spoke with the investigatory committee "at the direction of the township manager and [the other plaintiffs] thereafter cooperated in the hearings . . ., a task that was clearly required of them in accordance with the police manual." *Heller v. Fulare*, C.A. no. 3:2004-265, 2007 WL 1726521, *8 (W.D. Pa. 2007). There is no evidence that enforcing state ethics laws was within Plaintiff's duties, and it remains unclear whether Plaintiff's complaint was about violations of law or about other types of unprofessional or improper conduct. Furthermore, the "right to vote is personal," and signing or refusing to sign a candidate's petition is clearly related to the exercise of that right, which a citizen undertakes in his personal capacity. *United States v. Bathgate*, 246 U.S. 220, 227 (1918). Therefore, the Court cannot find that Plaintiff's refusal to sign the petition or his complaint about being asked to do so were made pursuant to his employment duties as opposed to as a citizen.

Defendants do not argue that Plaintiff's refusal and complaint were not speech on a matter of public concern, as described in *Connick v. Myers*, 461 U.S. 138 (1983). Since the refusal and complaint, construed in a light most favorable to Plaintiff, can be understood to concern the improper or illegal use of elected positions to influence future elections, the Court finds that they are on a

matter of public concern.  Therefore, Plaintiff's refusal to sign and his complaint about Dahlin's petition are speech undertaken "as a citizen on a matter of public concern" and are thus speech protected by the First Amendment.  *Garcetti*, 547 U.S. at 418 (2006).

Furthermore, Plaintiff's refusal to sign the petition is also protected by the First Amendment as a form of political affiliation.  No matter what motives the Plaintiff claims, signing or not signing such a petition is an act of affiliating oneself with, or refusing to affiliate oneself with, a political candidate, and it is the kind of act protected by the First Amendment. It is precisely the type of political support within a primary election that the Court of Appeals for the Third Circuit held was protected in *Curinga v. City of Clairton*, 357 F.3d 305 (3d Cir. 2004).

### b.      Plaintiff's Perceived Support of his Brother's Candidacy

For the purpose of this Motion, Defendants do not dispute that Plaintiff's support of his brother's candidacy was a protected activity under the First Amendment.  (Docket No. 74 at 6). Therefore, for the purpose of this Motion, this Court will assume this to be the case, merely noting that, like his refusal to sign Defendant Dahlin's petition, his support of his brother in the primary is protected as both speech and as a form of political affiliation.

### c.      Plaintiff's Complaints Regarding Holly Nicely

In support of their Motion for Summary Judgment, Defendants argue that Plaintiff "cannot establish that his complaints regarding Holly Nicely's employment, salary and/or benefits compared to his is a matter of public concern." (Docket No. 74 at 6).  In other words, they argue that these are matters of purely personal interest to the Plaintiff, not matters of public concern deserving of First Amendment protection under *Connick v. Myers*, 461 U.S. 138 (1983).

In the Second Amended Complaint, Plaintiff avers that he "had at various times criticized

the defendant Supervisors to their faces for having hired Holly Nicely, the daughter-in-law of

defendant Nicely, as the part-time township Secretary and Treasurer, but with rights to vacation pay

and benefits which were not given to plaintiff as the chief of police, which effectively meant that she

was paid more than the police chief."  (Docket No. 35 at ¶19).  Plaintiff was deposed extensively on

this aspect of his claims. (Docket No. 73-1 *passim*).  Despite the argument in his brief in opposition

to the motion for summary judgment that this was not merely a personal concern and that "the more

likely interpretation . . . is that as a resident of Darlington Twp. and therefore a taxpayer, he [was]

upset about the obvious impropriety involved in the glaring nepotism," there is no evidence that this

was his motivation or that this was the substance of his complaints.  (Docket No. 80 at 7).

　　　When asked whether he objected to Ms. Nicely's receipt of benefits because he was not given

the opportunity to purchase the same benefits or because he himself was not given those benefits,

Plaintiff replied:

> A　　The fact that they were -- I wasn't able to have the benefit -- the fact that I
> wasn't offered the same things that Holly was offered, that was what I was
> arguing.
> Q　　Whether it was paid for or not by the township?
> A　　Well, the simple fact is that she worked Monday, Wednesday, and Friday,
> 9:30 -- or nine to two or whatever and was paid benefits, retirement, the
> whole -- you know, the whole ball of wax.  So, yeah, I wanted what Holly
> had.

(Docket No. 73-1 at p. 46).  When asked why he thought the hiring and compensation of Ms. Nicely

was improper, and whether he ever made any "statements to any township supervisors criticizing

them for having hired . . . Holly," he stated that:

> A　　I spoke with Hans [Dahlin] about it, yes.
> Q　　when did you speak with Hans about that?
> A　　Several times throughout my career with them.
> Q　　And why did you think hiring Holly was improper?

. . . .

A     Well, the fact that she was given, you know, the benefits, the hourly rate was more than, you know, the road crew was making, several things like that. there were things that she, you know, received special treatment on hours. She worked three days a week and got all these benefits and she didn't even work an eight-hour day.

(*Id.* at 54-5).  As for the allegation of nepotism:

Q     And you thought that . . . she was getting special treatment because she was a relative of Mr. Nicely?

A     Bob McRoberts has made comments to that effect several times throughout my career at the township.

Q     What has he said?

A     He makes comments about how pretty she is and how nice she is, and when her and Dave were separated because of the domestic incident with them, that he's going to stick by Holly, she can do no wrong.  I mean, it's just -- he fell over her, basically, you know.

Q     How do you know that that's not because he likes the way she does her job as opposed to the fact that she's a relative of Mr. Nicely?

A     Because he's made some comments that might have sexual innuendos which are not job-related.

Q     Are you alleging that Mr. McRoberts gives her special treatment because she's a relative of Mr. Nicely.

A     Yes.

Q     What has he said about Holly that leads you to believe he likes her or gives her special treatment because she's a relative of Mr. Nicely?

A     I just explained some of the reasons.

Q     Well, you've explained the reasons that he's made favorable statements or potentially unfavorable comments about her.  What leads you to believe that he favors her because she's a relative of Mr. Nicely as opposed to the fact that he generally likes her?

A     The position was just created one day . . . for her, and another reason that I was -- I criticized it with Hans [Dahlin] is because [she was collecting unemployment while working for the Township and "banking" her hours, effectively carrying them over to later pay periods, and] . . .[10]  I went to the supervisors about it and thought it was something that should be addressed and it wasn't addressed for the simple fact is I wasn't allowed to carry hours over on my time sheets and I was told I couldn't do that.

---

[10] (Extensive discussion of Ms. Nicely's receipt of unemployment benefits and "banking" of hours omitted.)

. . . .

| | |
|---|---|
| Q | Did you ever contact the State Ethics commission to ask about whether or not a township could hire the daughter-in-law of one of the supervisors? |
| A | I don't recall or can't remember if I did. |
| Q | Did you ever contact the State Association of townships about this? |
| A | No. |
| Q | You never contacted anybody in Harrisburg -- |
| A | No. |
| Q | -- about Holly Nicely's status? |
| A | I didn't want to hurt Holly.  I explained to you I liked Holly.  She's a very intelligent girl.  My intent was to get what -- equal to what she had. |

(*Id.* at 55-60).  Thus, despite occasional references in his deposition and briefs to the impropriety of apparent nepotism or of unfair compensation when compared to other Township employees, the crux and sum of Plaintiff's complaints are that he wanted the same favorable employment terms as Ms. Nicely, and to the extent that he complains of her receiving special treatment, he does not actually allege that it was due to nepotism as opposed to general goodwill toward her.

Therefore, because the Court finds that Plaintiff's concerns were strictly personal and there is no evidence from which a reasonable jury could conclude that he complained to the Defendant Supervisors on a matter of public concern, Plaintiff's statements to Defendants concerning Ms. Nicely are not entitled to First Amendment protection and this portion of his claim fails.[11]

### d.      *Plaintiff's Application for Workers' Compensation*

Defendants argue that Plaintiff "cannot establish that his receipt of Workers' Compensation benefits is a matter of public concern." (Docket No. 74 at pp. 8-9).[12]  In support of this contention,

---

[11]

Plaintiff's complaints regarding Ms. Nicely likewise do not implicate the First Amendment's protections for political affiliation or any rights under the Petition Clause.

[12]

There is no question that Plaintiff's application for Workers' Compensation benefits was not made pursuant to his duties as an employee.

Defendants cite *Santiago v. Temple University*, in which the United States District Court for the Eastern District of Pennsylvania found that "the act of bringing [a Workers' Compensation] claim does not create a forum for idea-sharing, nor is it for the purpose of making allegations or filing charges of wrongdoing against a defendant that may be of public concern." 739 F. Supp. 974, 981 (E.D. Pa. 1990).

This Court is not aware of any case where the filing of a Workers' Compensation claim has been found to be speech on a matter of public concern, as there is no issue of fault raised in the process and the impact of the outcome is limited to the parties. *See, e.g., Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220 (6th Cir. 1997); *Roeder v. Ohio Dep't of Rehab. & Corr.*, 2006 U.S. Dist. LEXIS 14126, *27 (S.D.Oh. 2006); *Guadagni v. New York City Transit Auth.*, 2009 U.S. Dist. LEXIS 55251, *23 (E.D.N.Y. 2009).[13]  However, as discussed below, the application for Workers' Compensation benefits can be considered a petition, and is therefore protected activity under the Petition Clause.

### 2. Plaintiff's Petition Clause Claim

In *San Filippo v. Bongiovanni*, 30 F.3d 424, 438-42 (3d. Cir 1994), the Court of Appeals for the Third Circuit explained that the First Amendment's Petition Clause was not merely "a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press," but rather provides "an independent reason – a reason of constitutional dimension – to protect an employee

---

[13]

It does not suffice, as Plaintiff argues, for the Plaintiff to say that he has a property interest in receipt of Workers' Compensation benefits.  (Docket No. 80 at 8).  The fact that an individual has a property interest under the Fourteenth Amendment does not mean that his attempts to enforce that interest are a matter of public concern; to find that it did would be to convert all private litigation regarding real or personal property into a matter of public concern.

lawsuit or grievance."  And therefore, the Court of Appeals held that such petitions, defined as "submissions . . . that invoke the formal mechanisms for the redress of grievances," are protected by the First Amendment, even if they are not "matters of public concern" under *Connick*.  *Id*.; *see also Foraker*, 501 F.3d at 236.  In doing so, the Court of Appeals parted ways with a number of the other circuits where activities protected under the Petition Clause must meet the *Connick* requirement that they be on matters of public concern in order to forbid retaliation.  *Id*. at 440 n. 19 (citing cases from the Second, Fifth, Seventh, Ninth, and Eleventh Circuits requiring an employee's lawsuit to be on a matter of public concern to state a claim under § 1983).  The Court of Appeals explained that

> when government – federal or state – formally adopts a mechanism for redress of those grievances for which government is legally accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

*Id*. at 442.  Therefore, the "mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."  *Id.* at 443.

In *San Filippo*, the Court of Appeals specifically lists "workers compensation claims" as one type of proceeding that "share[s] this feature of invoking a formal mechanism for redress of grievances against the government." *Id*. at 440 n. 18.  Since it is uncontested that Plaintiff filed an application for workers compensation benefits, and there is no indication that it was a sham application, said application was protected by the Petition Clause of the First Amendment.

Therefore, some of Plaintiff's allegedly protected activities have survived the first step of the test.  His refusal to sign the petition, his complaints about it, and his perceived support of his brother

are all protected by the Free Speech Clause.  His application to receive Workers' Compensation benefits is protected by the Petition Clause.   These activities must therefore be further analyzed in the second step.

### B.      Does Plaintiff's Interest in the Described Activities Outweigh Defendants'?

To pass the second step, Plaintiff must show that his interests, "as a citizen, in commenting upon matters of public concern" outweigh those of "the [township], as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  This is a question of law, not fact.  *McGreevy*, 413 F.3d at 364.  The parties do not argue this step in their briefs, but the Court will address it.  At the outset, the Court notes that there is no contention that Plaintiff was in a "policymaking" or other position where political loyalty would be essential to the position itself.  *See Galli v. New Jersey Meadowlands Comm'n.* 490 F.3d 265, 270-71 (3d Cir. 2007).

#### 1..     *Plaintiff's Refusal to Sign Dahlin's Petition and His Perceived Support of his Brother's Candidacy*

Defendants do not argue that Plaintiff's refusal to sign Defendant Dahlin's petition or his perceived support of his brother interfered with the operations of Darlington Township government.  Given the weightiness of the First Amendment interest in one's choice to support or not to support a political candidate (protected both as political speech and as a form of political affiliation) the Court finds that Plaintiff's interest in not signing the petition and in supporting his brother's candidacy outweighs Defendant Township's interest in its operation as an employer.

#### 2.      *Plaintiff's Application for Workers' Compensation Benefits*

Defendants have not provided, and the Court cannot conceive of, any reason why Plaintiff's application for or receipt of Workers' Compensation benefits would impede the efficiency of the Township government.  Whether or not Plaintiff's injuries and alleged lack of a physician's release to work are considered incommensurate with his performing the duties of a police officer, these are distinct considerations from his application for or receipt of benefits for said injuries.[14]  Therefore, Plaintiff's interest in receiving his Workers' Compensation benefits outweighs any potential interest the Township would have in his not applying for them.

All of Plaintiff's remaining claims, therefore, pass the second step of the test and must be considered in the third.

### C.     Did Retaliation Cause Defendants' Actions Against Plaintiff, and Would Defendants Have Done the Same Absent Retaliatory Motives?

The Court of Appeals for the Third Circuit has made clear that the final steps of the inquiry, present questions of fact, to be left for a jury.  *Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 2001) (citing *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 889 (3d. Cir 1997) (recognizing second and third steps in *Pickering/ Mt. Healthy* analysis are questions for fact finder); *Watters v. City of Philadelphia*, 55 F.3d 886, 892 n. 3; *Zamboni v. Stamler*, 847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988) (noting whether protected activity acted as substantial or motivating factor in discharge and whether

---

[14]

Since Plaintiff was receiving Workers' Compensation for an injury sustained while working as a park ranger for the Pa. D.C.N.R., not as a police officer for the Township, his Workers' Compensation benefits were from the Commonwealth of Pennsylvania, not through the Township. *See* Docket No. 72, ¶33.   Defendants had no conceivable legitimate governmental interest in limiting his receipt thereof.

same action would have been taken regardless are questions for jury), *cert. denied*, 488 U.S. 899 (1988); *Johnson v. Lincoln Univ.*, 776 F.2d 443, 454 (3d Cir.1985) (holding "second and third questions ... should be submitted to the jury")).  Therefore, the Court remains mindful of its duty to interpret the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in receiving Plaintiff's favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir.2007). In doing so, however, it will not limit itself to the arguments of the parties but will consider the evidence as a whole.[15]

The questions at this stage are whether improper retaliation for any or all of the protected activities was a substantial or motivating factor in the Township's demotion and subsequent termination of Plaintiff, and whether Defendants would have taken those actions absent any improper retaliatory motive.  In other words: was improper retaliation the actual cause for Plaintiff's demotion and termination?

Defendants proffer a number of reasons for the demotion and eventual termination of Plaintiff.  Defendants claim that Plaintiff's demotion to patrolman in December 2007 or January 2008 was due to the reasons recorded in the January 4, 2008 letter to Plaintiff: (1) his failure to provide Defendant Township with documentation demonstrating the proper investment of retirement funds; (2) his failure to file his work schedules regularly; (3) his failure to conduct patrols properly; (4) his efforts to avoid obtaining building and septic tank permits; and (5) his failure to advise the Township that he was receiving Workers' Compensation benefits.  (Docket No. 73-5).  Defendants claim that Plaintiff's eventual termination on February 25, 2008 was due to the reasons recorded in the February

---

[15]

Courts are permitted to explore the record in search of any evidence that may be probative of causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

28, 2008 letter: (1) an incident between Plaintiff and his father-in-law on February 1, 2008; (2) Plaintiff's arrest for assault on his wife on February 1, 2008; and (3) his failure to return his police chief badges and a bullet-proof vest to Defendant Township when he was demoted.  (Docket Nos. 73 at ¶26; 73-14).

The task for the Court at the final step is to determine whether a reasonable jury, viewing the evidence in the light most favorable to Plaintiff and considering both the remaining allegedly retaliatory motives (Plaintiff's refusal to sign Dahlin's petition, his support of his brother's candidacy, and his receipt of Workers' Compensation benefits) and the Defendant's proffered nonretaliatory reasons, could find both that the former were a substantial or motivating factor in the employment action, and that the latter would not have resulted in the adverse employment actions by themselves.

### 1.     Were Defendants' Adverse Employment Actions Against Plaintiff Caused by Improper Retaliatory Motives?

As an initial matter, the Court can dispense with one of Defendants' arguments, namely the claim that Plaintiff's own testimony acknowledges that their proffered reason regarding Workers' Compensation is true while his proffered retaliatory motive regarding same is false.  The crux of Defendants' argument is that, during his deposition, Plaintiff "testified that he believed that Defendants took action against him because he did not advise the Supervisors that he had applied for and was collecting Workers' Compensation benefits through the State." (Docket No. 74 at 15) (citing Docket No. 73-1 at pp. 52-53).  Defendants contend that this constitutes an admission by Plaintiff of their proffered reason for his demotion or termination: his *failure to notify* Defendants of his receipt of workers compensation benefits, as opposed to his exercise of the right to receive them.

29

This Court cannot accept Defendants' interpretation of Plaintiff's testimony because there is more than one possible interpretation of the testimony in question, and at the summary judgment stage the facts must be considered in the light most favorable to Plaintiff. *McGreevy*, 413 F.3d at 363.

In relevant part, Plaintiff's deposition transcript reads as follows:

Q    What reason do you have to believe that the township took any type of action against you because you had applied for and received Workers' Compensation benefits from the state of Pennsylvania?

A    Because of their claiming of failure to notify them that I was on Work Comp.

Q    So you believe that a reason that the township had in either demoting or terminating your employment was because you failed to notify them that you were collecting Workers' Compensation benefits.

A    That they are saying – they're alleging I failed to notify them.  They were notified.

(Docket No. 73-1 at 52).  This Court is not foreclosing the possibility that Plaintiff's meaning was as Defendants maintain that "Defendants took action against [Plaintiff] because he did not advise the Supervisors that he had applied for and was collecting Workers' Compensation benefits through the State." (Docket No. 74 at 15).  However, Plaintiff's testimony could also be interpreted to mean that Plaintiff understood one of the reasons Defendants were putting forth as a nonretaliatory basis for his termination, but that he believed it to be a pretext for different, discriminatory reasons, a view that is more favorable to Plaintiff.

Next, the Court considers whether Plaintiff can show causation simply through the temporal proximity of his protected activities to his demotion or termination.  The temporal proximity between the protected activity and the adverse employment action is probative to the causation analysis. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).  However, courts in the Third Circuit only find causation based on temporal proximity alone when such proximity is "unusually

suggestive, commonly when only a matter of days elapsed." *Id.* at 280 (citing *Jalil v. Avdel Corporation*, 873 F.2d 701 (3d Cir. 1989)).

Plaintiff was first eligible for Workers' Compensation benefits from Pa. D.C.N.R. on March 30, 2006. (Docket No. 51-2 at ¶ 2(d)). The exact date that Defendants became aware of Plaintiff's Workers' Compensation claim is not in the record.[16]  Defendants were, of course, aware of his other protected activities as they occurred: when he refused to sign and complained about Defendant Dahlin's petition at the public meeting on February 12, 2007, and during the course of the primary which took place in May 2007.

The adverse employment actions took place at least six months later, when Plaintiff was demoted in December 2007 or January 2008, and when he was eventually fired in February 2008. This is not an "unusually suggestive" proximity, and the events are too distant for Plaintiff to maintain his claim for retaliatory termination based on temporal proximity alone. *See Farrell*, 206 F.3d at 281.  But, this does not mean that temporal proximity is not probative of the ultimate question of causation.

While this delay of months may suggest, as Defendants argue, that there is no temporal proximity suggestive of causation,[17] a number of factors could explain the delay.  First, Plaintiff did

---

[16]

It is likely that different Defendants were aware of it at different times.  Plaintiff has presented evidence that someone at Defendant Township must have been aware of his receipt of Workers' Compensation benefits before July 18, 2007, when a corrected notice of compensation was issued by the state, reflecting the input of Defendant Township as to Plaintiff's pay.  (Docket No. 80 at 13).  This indicates that someone employed by the Township must have sent in the paperwork regarding Plaintiff's Workers' Compensation, though there is no indication of who did so or whether the individual Defendants had any knowledge of it at that time.

[17]

Indeed, Defendants argue that it demonstrates just the opposite, since the Township allowed

not seek to return to work between June and December, 2007, at which time he was informed of his demotion to Patrolman.  (Docket Nos. 77 at ¶¶ 8, 10; 81 at ¶¶ 8, 10).  Secondly, as Plaintiff argues, Defendant Dahlin could have feared that any adverse action would become a campaign issue (Docket No. 80 at 11-2).  Third, Plaintiff argues, Defendants could have delayed acting because they feared liability for terminating his medical leave under state statutes.  (*Id.*)

Turning to the larger question of whether Plaintiff can show causation, the Court must consider the entire sequence of events.  Plaintiff admits that the initial conversation at the February 12, 2007 meeting where he refused to sign the petition was not heated, but was polite; and he admits that he does not mention any other instances of antagonism. (*Id.* at 20, 24).  But, Plaintiff testified that he was told by Defendant McRoberts in June 2007 that he was not being allowed to return to work at that time, just after his second surgery, because Defendant Dahlin was "very upset" at him for refusing to sign the petition. (Docket No 73-1 at 6-7).  And, Plaintiff states that Defendants never mentioned any problems with his application for Workers' Compensation benefits until the December 18, 2007 meeting with Defendant Dahlin, when Plaintiff sought to be reinstated as Police Chief and was instead demoted to Patrolman. (Docket No. 73-1 at 34; Docket No. 73-5 at ¶ 6).

Even interpreting this sequence of events in the light most favorable to Plaintiff, there is no evidence to indicate a causal connection between his application for or receipt of Workers Compensation benefits, which Plaintiff alleges Defendants knew of at least as early as July 18, 2007 (Docket No. 80 at 13), and his eventual demotion in December 2007 or termination in February 2008.  Plaintiff's argument that Defendants proffered a pretextual reason for his termination -- his

_____

Plaintiff to remain on medical leave indefinitely when it had no obligation to do so.  (Docket No. 74 at 12).

failure to *notify* them of his receipt of Workers Compensation benefits -- does nothing to suggest that the true reason was his receipt of them, as opposed to other retaliatory motives. Therefore, Plaintiff's potential claim based on retaliation for the application for Workers Compensation benefits, an activity protected by the Petition Clause, fails.

However, given the Plaintiff's intervening conversation with Defendant McRoberts in June 2007, which suggests the possibility of ongoing animus based on the earlier protected activity, it would not be unreasonable for a jury to find that there was a casual connection between Plaintiff's Speech Clause activities - his refusal to sign the petition, his complaints about it, and his perceived support of his brother - and his demotion in December, 2007.

As for Plaintiff's termination, although Defendants were undoubtedly aware of all the protected activities by December 18, 2007 (Docket No. 73-1 at 27), more than 2 months prior to his termination, which would normally lessen the impact of any temporal proximity argument, the parties agree that Plaintiff was not permitted to return to work for Defendant Township in the intervening period between his demotion and his termination. (Docket No. 71 at ¶¶ 3-4). This could be considered an "other intervening retaliatory act" by Defendant, stretching out the retaliation over a period of time, and supporting Plaintiff's claim that retaliation for his protected activities was a substantial factor in his termination. *Farrell*, 206 F.3d at 280.

Therefore, while Plaintiff cannot demonstrate causation via temporal proximity alone, the Court does find that the sequence of events permits a reasonable conclusion of causation as to Plaintiff's claim of retaliation based on his Speech Clause activities. The Court will not foreclose the possibility that a reasonable jury could find that improper retaliatory motives played a substantial or motivating factor in Defendants' demotion and eventual termination of Plaintiff.

33

###### 2. *Would Defendants Have Taken Adverse Employment Actions Against Plaintiff Were it Not for the Remaining Protected Activities?*

An employer can rebut a finding of improper retaliation by "demonstrating that it would have reached the same decision, even in the absence of the protected conduct." *McGreevy*, 413 F.3d at 364. In *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), the United States Supreme Court considered a case where an untenured teacher's employment was not renewed, in part because he had exercised his First Amendment rights. The Court explained that even though the "protected conduct played a 'substantial part' in the actual decision not to renew," it did not "necessarily amount to a constitutional violation justifying remedial action." *Id.* at 575. As the Court explained, the "District Court should have gone on to determine whether the [employer] had shown by a preponderance of the evidence that it would have reached the same decision as to [the employee's] reemployment even in the absence of the protected conduct." *Id.* at 576.

Defendants provide a number of nonretaliatory reasons for the adverse employment actions taken against Plaintiff. (Docket No. 71 at ¶¶ 7, 10). The Court will examine the reasons for both Plaintiff's demotion and termination.

Plaintiff admits that the reasons given by Defendant Dahlin for Plaintiff's demotion to patrolman at the December 18, 2007 meeting and those delineated in the January 4, 2008 memorandum were identical, and Defendants reiterate these reasons in their Brief in Support of Summary Judgment. (Docket Nos. 73-1 at 34-35; 74 at 3). In each instance, Defendants attributed Plaintiff's demotion to: (1) his failure to provide Defendant township with documentation demonstrating the proper investment of retirement funds; (2) his failure to file his work schedules regularly; (3) his failure to conduct patrols properly; (4) his efforts to avoid obtaining building and

septic tank permits; and (5) his failure to advise the township that he was receiving Workers' Compensation benefits.  (Docket No. 73-5)

Plaintiff does call some of these into question, creating questions of fact for the jury. Plaintiff claims that his own deposition testimony indicates that he *had* provided vouchers concerning the proper investment of retirement funds. (Docket No. 80 at 14).[18]  The Court has no further evidence before it on this question.  Similarly, Plaintiff contends in his deposition testimony that he *did*, in fact file police work schedules on time and that his doing so was never an issue until the end of his employment.  (Docket Nos. 80 at 14; 73-1 at 40).  Again, the Court has no further evidence to consider regarding this question.  And, Plaintiff argues that it is "demonstrably false" that he had failed to advise the Township of his receipt of Workers' Compensation benefits, given the corrected notice of compensation issued July 18, 2007, as discussed in note 16 *supra*.  (Docket No. 80 at 13).  Plaintiff does not specifically deny that he attempted to avoid obtaining building and septic tank permits.  In fact, his deposition testimony indicates that he disputes whether he needed a building permit, that he was surprised when it became an issue five years after his building project, of which Defendants knew, and that he, therefore, went about collecting information on other building projects that had been undertaken without permits to justify his own lack of a permit. (Docket No. 81-5 at 2-4).[19]  Therefore, issues of fact remain regarding the true cause of Plaintiff's

---

[18]

Neither party has filed this portion of Plaintiff's deposition as part of the record before the Court.

[19]

In his deposition, Plaintiff testifies that this became an issue in December of 2006, before his protected activities.  (Docket no. 35 at 2).  Therefore, this reason for his demotion cannot be considered a pretextual cover for retaliation for those activities.

demotion.

As for Plaintiff's termination, Defendant Township delineated its reasons in a letter dated February 28, 2008 (Docket No. 73-14) and reiterated that these were the bases for the termination in the instant motion for summary judgment. (Docket No. 71 at 3). Defendants claim that Plaintiff's eventual termination on February 25, 2008 was due to: (1) an incident between Plaintiff and his father-in-law on February 1, 2008; (2) Plaintiff's arrest for assault on his wife on February 1, 2008; and (3) his failure to return his police chief badges and a bullet-proof vest to Defendant Township when he was demoted. (Docket Nos. 73 at ¶26; 73-14).

Plaintiff testified that he *did* in fact return the police chief badges, and given the conflicting evidence, there appears to be a triable question of fact as to that issue. (Docket No. 80 at 14). However, he acknowledges that he did not return the bullet-proof vest until after the commencement of this litigation. (Docket No. 77 at ¶¶ 25-6). Plaintiff argues that the alleged assault of his wife and altercation with his father-in-law underlying the arrest and incident report cited by Defendants did not actually occur, as evidence for which he indicates that the charges were all dropped. (Docket No. 35 at 5-6). In sum, it is undisputed that Plaintiff did not turn in the bullet-proof vest, and, more importantly, that he was actually arrested for assault and that the incident report was filed. (*See* Docket Nos. 73-11; 73-12, 73-13). Defendants have consistently claimed that the arrest and incident report themselves were some of the reasons for his eventual termination. And, the Court agrees that these are reasonable, independent bases for his termination.

Further, the reasons proffered by Defendants in terminating Plaintiff raise questions regarding Plaintiff's trustworthiness. The United States Court of Appeals for the Third Circuit has found that such reasons are generally credible reasons for taking adverse employment actions against a police

officer, given the level of trust inherent in the functioning of a police department. *See Persico v. City of Jersey City*, 67 Fed. Appx. 669, 674 (3d Cir. 2003) (citing *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998); *Campbell v. Towse*, 99 F.3d 820, 829-30 (7th Cir. 1996)).

Since they have adduced alternate reasons would have resulted in Plaintiff's termination even absent retaliatory motives, Defendants have shown that retaliation did not cause them to fire him. They have, therefore, successfully rebutted that portion of Plaintiff's claim. However, those reasons – the arrest for assault, the incident report, and Plaintiff's failure to return the bulletproof vest – all occurred after his demotion and thus, cannot be considered reasons for the initial demotion. While Defendants have defeated Plaintiff's claim that retaliation motivated their *termination* of him, they have not completely rebutted the claim that it motivated his *demotion*.

### D.    Punitive Damages

Plaintiff also seeks punitive damages against the individual Defendants, Dahlin, McRoberts, and Nicely. (Docket No. 35 at 8). The Supreme Court of the United States articulated the standard for awarding punitive damages under § 1983 as follows:

> a jury may ... assess punitive damages ... under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

*Smith v. Wade*, 461 U.S. 30, 56 (1983). Thus, in order for a jury to assess punitive damages, it must be able to find either that the defendant had an "evil motive or intent" or that the defendant acted with reckless or callous indifference to the rights of the plaintiff. *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006); *Brennan v. Norton*, 350 F.3d at 428-29 (3d. Cir. 2003). "'Despite its utility as a deterrent, the punitive damages remedy must be reserved . . . for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or

37

injunctive relief.'" *Keenan v. City of Philadelphia*, 983 F2d. 459, 469-70 (3d. Cir. 1992) (quoting

*Cochetti v. Desmond*, 572 F.2d 102-105-06 (3d Cir. 1978)). "[I]t is clear under the Court's holding

in *Smith v. Wade* that punitive damages require more than the retaliatory motive itself." *Brennan*,

350 F.3d at 429-30 (3d Cir. 2003).

Defendants argue that Plaintiff has not adduced any evidence or facts indicating that the

individual Defendants had an evil motive or that their conduct was recklessly or callously indifferent

to Plaintiff's federally protected rights. (Docket No. 74 at 19-20). Plaintiff argues that "this boils

down to a factual question concerning defendants' motives, which may not be determined on

summary judgment." (Docket No. 83 at 1, n.1). While it is true that motivation is often a factual

question, Plaintiff still must make *some* showing allowing a reasonable jury find the necessary

elements of a punitive damages claim: evil motive, recklessness, or callous indifference on the part

of the Defendants. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Two decisions of the Court of Appeals for the Third Circuit regarding punitive damages in

First Amendment retaliation cases are instructive here: *Brennan* and *Springer. See Eichenlaub v.

Township of Indiana, et al.*, C.A. Nos. 05-2476, 05-2498 214 Fed. Appx. 218 (3d Cir. Jan. 25, 2007)

(not precedential). In *Brennan*, the Court upheld the district court's judgment as a matter of law

against the award of punitive damages, even after a jury had awarded them, reasoning that, although

the plaintiff, Brennan, presented the "theory" that the individual defendant

> was the omnipresent, driving force behind everything negative that happened to him
> . . . . the conspiratorial picture Brennan paints is not consistent with the record. He
> has produced no evidence that [the defendant] orchestrated a retaliatory campaign
> against him . . . . We do agree with Brennan's claim that this record supports a
> finding that Brennan's protected speech was a motivating factor in [the individual
> defendant's own retaliatory actions]. However, the record does not support a finding
> that [the individual defendant] acted out of either recklessness or callousness.

> Indeed, a contrary conclusion would mean that any finding of retaliatory motive would automatically support punitive damages . . . .  [I]t is clear under the Court's holding in *Smith v. Wade* that punitive damages require more than the retaliatory motive itself.

*Brennan*, 350 F.3d at 429-30 (3d Cir. 2003).  Three years later, in *Springer*, the Court of Appeals found the opposite,  holding that there was sufficient evidence to support a jury's punitive damages award, when the jury's verdict was supported both by strong circumstantial evidence, such as "unusual" procedures in the termination of the plaintiff, and by substantiated evidence of the Defendant's vindictive "attitude" towards the plaintiff.  *Springer*, 435 F.3d at 281-83 (3d Cir. 2006). In *Springer*, the plaintiff presented testimony by three witnesses (including the plaintiff and the individual defendant himself) that the individual defendant was "upset and unhappy" with the plaintiff.  *Springer*, 435 F.3d at 281-83 (3d Cir. 2006).  The Appeals Court found this evidence supported an award of punitive damages, unlike the "unsubstantiated allegations" in *Brennan*.  *Id.*

In the present case, Plaintiff has adduced almost no evidence indicating evil motive or recklessness and callous indifference to Plaintiff's rights on the part of  the individual Defendants. The only evidence even suggesting as much is Plaintiff's own testimony that Defendant McRoberts told him in June 2007 that Defendant Dahlin was "very upset" about Plaintiff's refusal to sign his petition[20], and Plaintiff's own testimony about his impressions of the individual Defendants' reactions to his refusal.  (Docket No. 73-1 at 6-9).  Plaintiff testified as follows:

> Q:    So I guess – but then you're saying that you contacted Mr. McRoberts to find out what you were supposed to do [regarding time off for surgery in June 2007]?

---

[20]

Neither Plaintiff nor Defendants have provided a deposition transcript or other testimony by Defendant McRoberts, beyond his affidavit (Docket No. 73-15) which does not address the issue of Defendant Dahlin's state of mind or what Defendant McRoberts may have told Plaintiff about same.

A:     Basically, I asked – I don't know if I had this letter or not, but the main conversation was about – to explain to him what was going on. That's whenever he informed me that the reason this has become so – such an issue is because Hans [Dahlin] was very upset with me because I did not sign his petition and that's what this turned into.

Q:     So you believe that the reason that you weren't permitted to come back to work in June of '07 after your second surgery was the fact that you didn't sign Mr. Dahlin's petition as opposed to the fact that you weren't released to duty?

A:     I believe that's what started all of this, and I was told those exact words from Bob McRoberts, Bob McRoberts, that I was – that Hans was very upset that I would not sign his petition, and that dominated the conversation.

Q:     So you called Mr. McRoberts to find out what you were supposed to do with respect to your employment?

A:     Yes.

Q:     And Mr. McRoberts told you that Mr. Dahlin was upset because you didn't sign his petition?

A:     Yes.

Q:     And are you testifying that Mr. Dahlin – let me rephrase that. Sorry.

             Is your testimony that Mr. McRoberts specifically told you that you were not permitted to work because Mr. Dahlin was upset with you because of this?

A:     Basically, in those words, yes, but the reason this was blown up is because of the petition. Up until this point, nothing – I believe I did have this [letter regarding being released to work] – I don't know if I received it or not. I don't know. I believe I did. Everything was done by word of mouth up until this point. Everything was undocumented. It was all handshake or talking and that's how things worked. Now, all of a sudden, they're going to get official on me and start documenting things, and that's basically, I believe, why I called Bob.

Q:     In this conversation with Mr. McRoberts, is that the first time you found out that Mr. Dahlin was supposedly upset with you because you didn't sign his petition?

A:     No.

Q:     When did you find out that –

A:     At the meeting that I didn't sign the petition.

. . . .

Q:     But I'm wondering why you believe that this would be a big issue with Mr. Dahlin if your signature did not appear on his signature – on the petition.

A:     To go in sequence, first off, it was a big deal because I was glared at by Bob McRoberts the entire meeting. After the meeting, the reception that I was given as far as, you know, talking to him about that, I didn't appreciate them asking me to sign a petition, I was given the impression that it was – that they were – they were stung by what I did.

. . . .

Q:    Well, what was Mr. McRoberts' reaction that causes you to believe he was stung by your saying –

A:    Because when I refused the petition, he went – I can't – I mean, I guess – I can do it.  I can't – he went up there and crossed his arms and stared at me the entire meeting like this in the face.

Q:    You're indicating that he crossed his arms and stared at you during the rest of the meeting?

A:    Yes, he did.  Yes.

Q:    What did Mr. Dahlin do that caused you to believe that he was stung by your refusal to sign the petition?

A:    They just couldn't believe that I – I would ask them – or tell them that I thought it was not proper for them to do that.  As far as – I don't know any specifics.  They were just – you know – I knew I struck a nerve with them by, you know, confronting them with it.

Q:    Well, you specifically indicated what Mr. McRoberts' conduct was that caused you to believe he was stung, but, specifically, what did Mr. Dahlin do or say that caused you to believe that he was stung by this?

A:    John and Bob were both very quick to answer and I guess snippy – for lack of a better word – in answering questions, and I guess rude, so to speak, in talking to me and explaining their actions.

Q:    What did they say?

A:    Just that they appreciated me telling them that, they'll look into it to see if anything they did was wrong.

Q:    That's what John and Bob told you after the meeting?

A:    One of them said.  I'm paraphrasing everything, so --

Q:    What did Mr. Dahlin say about this refusal to sign the petition?

A:    He said thank you, what – you know, see you, basically.

Q:    Did anybody say to you that they didn't expect you to sign the petition because your brother was running?

A:    No.

Q:    Was this a heated conversation between yourself and the supervisors after the meeting about the petition?

A:    No, it wasn't heated.

(Docket No. 73-1 at 6-20).

This Court recently dealt with the question of whether to grant summary judgment on another

§ 1983 claim for punitive damages in *Malone v. Economy Borough Municipal Authority*.  In that

case, this Court found that the plaintiff had "offered evidence that [the individual defendants]

engaged in deliberate conduct to retaliate against her," including not only the plaintiff's testimony describing said conduct but also the individual defendant's own testimony regarding his displeasure with the plaintiff's protected activity, as well as testimony and documentary evidence of the individual defendant's treatment of plaintiff, including disparaging remarks. *Malone v. Economy Borough Mun. Authority*, --- F.Supp.2d ---- *24-5, 2009 WL 3756673 (W.D.Pa., Nov. 9, 2009).

Even viewing the evidence before the Court in the light most favorable to Plaintiff, the Court finds that it does not make a showing comparable to that in *Malone* or *Springer*. In many ways, this case is far more similar to the unsubstantiated allegations in *Brennan* than the substantial evidence present in those two cases. However, mindful of the role of the jury in determining such questions, the Court will not foreclose the possibility that a reasonable jury could, perhaps after assessing the demeanor and credibility of the parties, find that even this proffered evidence is sufficient to support a finding of reckless or callous indifference to Plaintiff's rights and could, therefore, award punitive damages.

Therefore, Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages is denied.

VI.     **CONCLUSION**

Based on the foregoing, Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part.

It is GRANTED as to all Plaintiff's claims concerning his termination, and as to any claims that he was retaliated against for his complaints about Holly Nicely or for his application for Workers' Compensation benefits. But, it is DENIED as to Plaintiff's claim that his demotion was

in retaliation for his refusal to sign Defendant Dahlin's petition, for his complaints about same, and

for his perceived support of his brother's candidacy, all activities protected by the First Amendment;

it is also denied as to Plaintiff's claims for punitive damages against the individual defendants.

     An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: February 17, 2010
cc/ecf: All counsel of record.